IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

COLONY INSURANCE COMPANY,

    *Plaintiff,*

vs.

GLOBAL POWER GENERATION
SERVICE CORPORATION OF FLORIDA;
SUNFLOWER ELECTRIC POWER
CORPORATION; and M&S STEEL, INC.,

    *Defendants.*

Case No. 17-CV-2690-EFM

**MEMORANDUM AND ORDER**

    Colony Insurance Company ("Colony") filed this action against Global Power Generation Service Corporation of Florida ("GPGS"), Sunflower Electric Power Corporation ("Sunflower"), and M&S Steel, Inc. ("M&S") seeking a declaratory judgment from this Court that it does not owe a duty to defend or a duty to indemnify damages arising from the failure of a combustion turbine owned by Sunflower after M&S and GPGS performed repair and maintenance work on the turbine. Sunflower filed an answer, M&S filed an answer and counterclaim, which it later amended, and GPGS filed a Motion to Dismiss or Stay. This matter comes before the Court on (1) Colony's Motion to Dismiss M&S Steel, Inc.,'s Counterclaim, to Have Allegations in Colony's Complaint Deemed Admitted, and to Strike Portions of M&S's Answer and Defenses (Doc. 20) ("First Motion to Dismiss"), (2) Colony's Motion to Dismiss M&S Steel, Inc.,'s Amended Counterclaim

(Doc. 33) ("Second Motion to Dismiss"), and (3) GPGS's Motion to Dismiss or Stay (Doc. 46). For the reasons explained below, the Court (1) denies Colony's First Motion to Dismiss as moot, (2) denies Colony's Second Motion to Dismiss, and (3) denies GPGS's Motion to Dismiss or Stay.

## I. Factual and Procedural Background

According to Colony's Complaint, Colony issued a commercial general liability policy ("Policy") to GPGS, covering the policy period of October 22, 2014, to October 22, 2015. Colony brings the current action to determine whether it has a duty to defend or a duty to indemnify GPGS or M&S due to the failure of Sunflower's combustion turbine. It argues that three exclusions preclude coverage under the Policy.

*Sunflower v. M&S and GPGS*[1]

Effective September 17, 2014, M&S entered into a Master Service Agreement ("MSA") with Sunflower to perform work on a General Electric Company, MS7001, Frame 7, combustion turbine, S/N 248854 ("turbine") at Sunflower's facility in Garden City, Kansas. Section 1 of the MSA defines the scope of the contract and states: "This Agreement is for the provision of furnishing qualified labor, experienced supervision, specialized tools, equipment, and material as may be necessary to perform services (services) to Sunflower by Supplier[2] as outlined in the specifications set forth in Exhibit B."

The MSA includes an indemnification section that provides, in part:

Each party (the Indemnifying Party) will indemnify, hold harmless, and defend the other party and its officers, directors, agents, employees, assigns, representatives, contractors, and successors in interest (collectively, the Indemnified Party) from all claims, liabilities, fines, interest, costs, expenses,

---

[1] Except where otherwise noted, the facts summarized in this section represent the facts as alleged by Sunflower in the underlying lawsuit Sunflower brought against M&S and GPGS. *See* Case No. 17-cv-1158 (D. Kan.).

[2] The MSA designates M&S as the "Supplier."

and damages (including reasonable attorneys' fees) incurred by the Indemnified Party (collectively, the Indemnified Losses), for any damage, injury, death, loss or destruction of any kind to persons or property, to the extent the damage, injury, death, loss or destruction arises out of or is related to the conduct, negligence, error, omission, willful misconduct, misrepresentation, breach of warranty or other breach of this Agreement on the part of the Indemnifying Party or any of its servants, representatives, agents, employees or contractors.

The Specifications attached to the MSA identify the scope of the contract in Section 4.0 to include "furnishing all labor, materials, tools, any transportation costs, and miscellaneous equipment and supplies necessary to perform the work." Section 4.4 covers "Work Details" and includes "Reassembly," and the installation of transition pieces.

M&S and GPGS entered into a subcontract on October 30, 2014—prior to beginning work under the MSA—whereunder GPGS agreed to perform certain work on the turbine under the MSA. The subcontract stated that the subcontractor "shall furnish the labor, materials, tools, implements, design services, and/or other work and apparatus necessary to perform and complete to Contractor's satisfaction and the Owner's specifications the work described in attached Exhibit B (the "Subcontract Work")." Exhibit B states, in part:

> GPGS is please [sic] to provide one (1) full time Technical Consultant for the upcoming Sunflower Electric Power Corporation (SEPC) Garden City S-4 gas turbine combustion inspection and maintenance. Additionally, M&S and GPGS have agreed to a profit sharing agreement based on the project sale, technical consulting and tools for the subject project as outline [sic] below.
>
> M&S / GPGS profit sharing agreement whereas M&S provides project mechanical labor, equipment, tools and GPGS provides the customer introduction, project sale, technical oversight, tools and equipment.

The subcontract contained an indemnity provision and certain insurance requirements. These provisions provide, in part:

> 7. **Indemnity by Subcontractor.** To the fullest extent permitted by law, Subcontractor shall indemnify and hold Contractor, Owner, the Project Architect, their agents, consultants and employees harmless from and against

all claims, losses, costs and damages, including but not limited to attorneys' fees, pertaining to the performance of the Subcontract and involving personal injury, sickness, disease, death or property damage. This indemnification agreement is binding on the Subcontractor, to the fullest extent permitted by law, regardless of whether any or all of the persons and entities indemnified hereunder are responsible in part for the claims, damages, losses or expenses for which the Subcontractor is obligated to provide indemnification. This indemnification provision does not negate, abridge or reduce any other rights or obligations of the persons and entities described herein with respect to indemnity.

8. **Insurance Requirements.** Subcontractor shall purchase and maintain Insurance of the following types of coverage and limits of liability:

8.1. *Commercial General Liability* (CGL) with limits of Insurance of not less than $1,000,000 each occurrence and $2,000,000 Annual Aggregate.

. . . .

8.1.4 Contractor, Owner and all other parties required of the General Contractor, shall be included as insureds on the CGL, using ISO Additional Insured Endorsement CG 20 10 11 85 or an endorsement(s) providing equivalent coverage to the additional insureds such as CG 2033 and CG 20 37. This insurance for the additional insureds shall be as broad as the coverage provided for the named insured subcontractor. It shall apply as Primary and Non-Contributing Insurance before any other insurance or self-insurance, including any deductible, maintained by, or provided to, the additional Insured.

. . . .

M&S and GPGS performed work on the turbine pursuant to the MSA from approximately November 3, 2014, to December 6, 2014, which included work on transition pieces, bolts, and lockplates. According to the Report Summary provided to Sunflower, the following services and/or work occurred on the Turbine on December 1, 2014: "install Combustion System bull horns and transition pieces" and "Transitions Pieces installed."

On August 6, 2015, the turbine suffered a catastrophic and sudden failure, and the subsequent visual inspection revealed that transition pieces had failed, were no longer attached,

were loose and not fully seated, or were missing a bolt and lockplate. Sunflower incurred damages in excess of $3.3 million due to this failure.

Sunflower brought a lawsuit against M&S and GPGS on July 5, 2017, alleging various causes of action against each Defendant. Sunflower alleges claims for breach of contract, breach of contract indemnity, breach of express warranty, breach of implied warranty, and negligence against both M&S and GPGS.[3]

M&S filed a crossclaim against GPGS alleging four counts. In Count I, M&S alleges that GPGS was contractually obligated to indemnify, hold harmless, defend, and insure M&S from the claims and allegations asserted by Sunflower, and that GPGS breached the subcontract by (1) failing and refusing to accept M&S's demands and tenders, (2) failing and refusing to indemnify and hold harmless M&S against Sunflower's claims, (3) failing to defend and/or provide a defense to M&S against Sunflower's claims, and (4) failing to name M&S as an additional insured or provide M&S with insurance for at least three years after completion of the work complained of by Sunflower. In Count II, M&S alleges that separate and apart from the subcontract, GPGS understood that it was to provide technical oversight, quality control, technical compliance, inspection, and supervision of the work complained of by Sunflower in its Complaint, of which GPGS knew M&S was relying on GPGS to perform, and that M&S is expressly and impliedly entitled to indemnification from GPGS. Count III is for breach of contract due to GPGS's failure to perform its obligations under the subcontract. Count IV is for negligence based on GPGS's alleged failure to exercise reasonable care or competence in the performance of its obligations.

---

[3] It pursues its contract, indemnity, and warranty claims against GPGS under a third-party beneficiary theory.

*The allegations in this lawsuit*

Colony maintains that the Policy issued to GPGS contains two exclusions applicable to the claims asserted against GPGS and M&S in Sunflower's lawsuit against GPGS and M&S, and which preclude coverage under the Policy. The Policy provides:

> **2. Exclusions**
> This insurance does not apply to:
> . . .
> **k. Damage to Your Product**
> "Property damage" to "your product" arising out of it or any part of it.
>
> **l. Damage to Your Work**
> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.
> . . .

Colony alleges "[t]he gravamen of the claims asserted in Sunflower's Complaint [and in M&S's crossclaim] are for property damage to the work or products provided by Global and M&S on the Sunflower Project." Colony also alleges that the Professional Services Exclusion, an endorsement to the Policy, precludes coverage for Sunflower and M&S's claims against GPGS, as the claims "involve property damage arising directly or indirectly out of the rendering or failure to render a 'professional service'."[4]

---

[4] The endorsement modifies the insurance provided to exclude bodily injury and property damage "arising directly or indirectly out of the rendering or failure to render any 'professional service' except by endorsement to this policy and then only to the extent of such endorsement." It defines "professional service" to include "(2) Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications," and "(3) Engineering services, including related supervisory or inspection services."

In response to Colony's Complaint, Sunflower filed an answer, M&S filed an answer and counterclaim, which it subsequently amended,[5] and GPGS filed a Motion to Dismiss or Stay. M&S's Amended Answer and Counterclaim alleges that its subcontract with GPGS constitutes an "Insured contract" as defined by the Policy, that M&S is an "additional insured" under the Policy, that Colony owes it a duty to defend and duty to indemnify under the Policy, that Colony denied M&S's demand for defense and indemnity, and that no exclusions contained in the Policy release obviate or negate Colony's obligations and duties under the Policy. In Count I, M&S brings a claim against Colony for breach of contract, based on Colony's failing and refusing to defend M&S against Sunflower's claims and its denying an obligation to provide indemnification to M&S as it relates to Sunflower's claims. Count II asserts a cause of action for bad faith. Count III seeks a declaratory judgment in its favor. Count IV seeks attorneys' fees and penalties under Kansas, Georgia, and Florida law. GPGS's Motion to Dismiss or Stay argues that resolution of this declaratory judgment action requires a determination of factual issues relevant in the underlying lawsuit filed by Sunflower against M&S and GPGS.

Colony requests dismissal of Counts II, III, and IV of M&S's Amended Answer and Counterclaim, and opposes GPGS's Motion to Dismiss or Stay.

## II. Legal Standard

Under Fed. R. Civ. P. 12(b)(6), a party may move for dismissal of "a claim for relief in any pleading" that fails to state a claim upon which relief can be granted. Upon such motion, the Court must decide "whether the [pleading] contains 'enough facts to state a claim to relief that is plausible

---

[5] Colony filed its First Motion to Dismiss before M&S amended its answer and counterclaim. This Motion is moot in light of M&S's subsequent filing of the First Amended Answer and First Amended Counterclaims of Defendant M&S Steel, Inc. ("Amended Answer and Counterclaim").

on its face.' "[6] "[T]he mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient;" rather, the pleading "must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[7] The Court does not "weigh potential evidence that the parties might present at trial," but assesses whether the pleading "alone is legally sufficient to state a claim for which relief may be granted."[8] In determining whether a claim is facially plausible, the Court must draw on its judicial experience and common sense.[9] All well-pleaded facts are assumed to be true and are construed in the light most favorable to the non-moving party.[10] "Although plaintiff need not allege every element of [its] action in specific detail, [it] cannot rely on conclusory allegations."[11]

### III. Analysis

**A. Colony's Second Motion to Dismiss M&S's Counterclaims**

Colony seeks dismissal of Counts II, III and IV of M&S's Amended Answer and Counterclaim under Fed. R. Civ. P. 12(b)(6). It argues that M&S does not state a claim for "bad faith" under Kansas, Florida, or Georgia law, that M&S's declaratory judgment action should be dismissed as redundant and unnecessary, and that M&S's request for attorneys' fees should be dismissed because it appears predicated in whole or in part on the bad faith claim and in whole or in part on Georgia law.

---

[6] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[7] *Ridge at Red Hawk*, 493 F.3d at 1177 (emphases in original).

[8] *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quotation omitted).

[9] *Iqbal*, 556 U.S. at 679.

[10] *Albers v. Bd. of Cty. Comm'rs of Jefferson Cty.*, 771 F.3d 697, 700 (10th Cir. 2014).

[11] *See Hall v. Bellmon*, 935 F.2d 1106, 1113 (10th Cir. 1991) (internal citations omitted).

*1. Count II – Bad faith claim*

Before addressing whether M&S has adequately pleaded its bad faith claim, the Court first must determine, if it can, which states' law applies to M&S's claim. When a federal court sits in diversity jurisdiction, it applies the conflict of law rules of the forum in which it sits—here, Kansas. "Generally the party seeking to apply the law of a jurisdiction other than the forum has the burden to present sufficient facts to show that other law should apply."[12]

Kansas courts addressing conflict of law issues follow the Restatement (First) of Conflict of Laws (1934) ("Restatement (First)"), which contains two general principles for contracts cases.[13] First, "[t]he primary rule, *lex loci contractus*, calls for the application of the law of the state where the contract is made."[14] This rule applies "[w]hen a case calls for interpretation of an original insurance contract."[15] Second, "the law of the place of performance determines the manner and method of performance."[16] The Tenth Circuit has noted that "Kansas courts have struggled in determining whether questions raised in cases before them are governed by the law of the place of performance or the place where the contract was made."[17]

---

[12] *In re K.M.H.*, 285 Kan. 53, 169 P.3d 1025, 1032 (2007) (quotation marks and citation omitted). Indeed, "Kansas courts have often leaned toward a *lex fori*, or law of the forum, approach, opting to apply Kansas law absent a clear showing that another state's law should apply." *Id*. (citations omitted).

[13] *Layne Christensen Co. v. Zurich Can.*, 30 Kan. App. 2d 128, 38 P.3d 757, 766 (2002); *see also Moses v. Halstead*, 581 F.3d 1248, 1252 (10th Cir. 2009).

[14] *Layne Christensen*, 38 P.3d at 766 (citations omitted).

[15] *Id*. at 759, syl. ¶ 9.

[16] *Id*. (citations omitted).

[17] *Moses*, 581 F.3d at 1252; *see also Layne Christensen*, 38 P.3d at 766 ("Courts have struggled on occasion to determine whether the issues in a particular case are governed by *lex loci contractus* or the law of the place of performance.") (citations omitted); Restatement (First) of Conflict of Laws § 358 cmt. b (1934) (noting that "there is no logical line which separates questions of the obligation of the contract . . . from questions of performance"). In *Moses*, the Tenth Circuit predicted that the Kansas Supreme Court would conclude that whether a plaintiff had an action for negligent or bad faith refusal to settle a claim "goes to the substance of [the insurer's] contractual duties rather than the manner of performance," and thus, would be governed by the law of the place of contracting. 581 F.3d

Neither party attempts to explain whether the issue before the Court goes to contract interpretation, such that the law of the place of contracting governs, or goes to performance, such that the law of the place of performance governs, or if questions relating to both interpretation and performance exist. Further, at this stage in the litigation, the Court lacks sufficient information to determine either the place of contracting or the place of performance.[18]

The Court is not persuaded that M&S has failed to adequately plead a claim based on Colony's alleged failure and refusal to defend M&S against Sunflower's claims in bad faith. It is unclear which states' law applies to this claim, and regardless, the Court is not persuaded that dismissal is proper under any states' law. Accordingly, Colony's request to dismiss Count II is denied.

  2.    *Count III – Request for declaratory judgment*

Colony asserts that Count III "essentially seeks the same relief as the Complaint, except in its own favor, and is therefore redundant and unnecessary." M&S argues that its claim for declaratory judgment presents issues distinct from those presented by Colony. As an initial matter, other judges in this District have stated "that there is 'no rule preventing the assertion of a counterclaim merely because the theory relied upon is the converse of that in the complaint.' "[19]

---

at 1254. It further predicted, however, that the law of the place of performance would apply to whether the insurer "fulfilled its contractual obligation to act in good faith to settle." *Id*.

[18] Under Kansas conflict of law rules, "[a] contract is made where the last act necessary for its formation occurs." *Layne Christensen*, 38 P.3d at 767 (citation omitted). In the context of insurance policies, Kansas "courts have repeatedly held the contract is made where the policy is delivered." *Id*. (citations omitted). While Colony alleges that the Policy "was issued and delivered" in Florida, M&S denies this allegation (based on a lack of information). It would be inappropriate for the Court to grant a Rule 12(b)(6) motion based on facts not contained in the non-moving party's pleading and denied by the non-moving party.

[19] *Sprint Nextel Corp. v. Middle Man, Inc.*, 2013 WL 1197137, at *1 (D. Kan. 2013) (quoting *Blue Cross & Blue Shield of Kan., Inc. v. St. Paul Mercury Ins. Co.*, 1990 WL 41403, at *1 (D. Kan. 1990)).

Regardless, the Court concludes that M&S's counterclaim for declaratory judgment does not present issues identical to those in Colony's Complaint. Thus, the Court declines to dismiss M&S's counterclaim as redundant.

Colony's Complaint states that the Policy contains exclusions applicable to the claims asserted against Global and M&S, including the "Damage to Your Product," "Damage to Your Work," and "Professional Services" exclusions. M&S asks for a declaratory judgment (1) that it is an additional insured under the Policy, (2) that even if it is not an additional insured, that Colony is obligated to defend, indemnify, and insure M&S relative to Sunflower's claims under the "insured contract" and "Contractual Liability" provisions of the Policy, (3) that the Policy provides defense, indemnification and insured coverage to M&S relative to Sunflower's claims against it, and (4) that no exclusion in the Policy precludes coverage.

Colony's Complaint does not seek an order declaring that M&S is not an additional insured under the Policy, and does not mention the "insured contract" or "Contractual Liability" provisions of the Policy. If Colony does not succeed in showing that one or more of the three exclusions it relies upon preclude coverage, then M&S's counterclaim for declaratory judgment will not be resolved. While some overlap exists between Colony's Complaint and M&S's counterclaim, M&S's claim presents distinct questions that the resolution of Colony's Complaint may not address. Accordingly, the Court denies Colony's request to dismiss M&S's claim for declaratory judgment.

   *3. Count IV – Request for attorneys' fees and penalties*

Colony argues that Count IV should be dismissed because it appears predicated in whole or in part on bad faith, and in whole or in part on Georgia law. M&S specifically cites Kansas law as authority for its request for attorneys' fees. Strangely, however, Colony does not argue that

M&S is not entitled to attorney's fees under Kansas law. Regardless, the Court has not dismissed Count II and Colony has not persuaded the Court that it should dismiss M&S's request for attorneys' fees and penalties.[20]

**B.      GPGS's Motion to Dismiss or Stay**

The Declaratory Judgment Act states, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."[21] "While this statute vests the federal courts with power and competence to issue a declaration of rights, the question of whether this power should be exercised in a particular case is vested in the sound discretion of the district courts."[22] GPGS emphasizes that this Court "has *complete* discretion to decline to exercise jurisdiction in a declaratory judgment action." It fails to recognize however, that the Tenth Circuit has instructed district courts to consider five factors when analyzing how to exercise this discretion. These include:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to *res judicata*"; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.[23]

---

[20] Although M&S labels its request for attorneys' fees as a separate "Count" in its Amended Answer and Counterclaim, it does not appear to be a separate cause of action, but rather a claim for relief based on the pleaded causes of action.

[21] 28 U.S.C. § 2201(a).

[22] *St. Paul Fire & Marine Ins. Co. v. Runyon*, 53 F.3d 1167, 1169 (10th Cir. 1995) (internal citations omitted).

[23] *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994) (quoting *Allstate Ins. Co. v. Green*, 825 F.2d 1061, 1063 (6th Cir. 1987)).

When reviewing a district court's decision on whether to hear an action brought under the Declaratory Judgment Act, the Tenth Circuit "will not engage in a *de novo* review of all the various fact-intensive and highly discretionary factors involved," but rather "will only ask whether the trial court's assessment of them was so unsatisfactory as to amount to an abuse of discretion."[24]

Neither party addresses the *Mhoon* factors, and while the Court has discretion in determining whether to hear an action brought under the Declaratory Judgment Act, that discretion is not unfettered. On the current record—which lacks any reference to or analysis of the *Mhoon* factors—the Court does not believe that it can satisfactorily assess the factors. Accordingly, the Court denies GPGS's Motion to Dismiss or Stay.

### IV.    Conclusion

For the reasons explained above, the Court denies Colony's Second Motion to Dismiss and GPGS's Motion to Dismiss or Stay, and denies as moot Colony's First Motion to Dismiss.

**IT IS THEREFORE ORDERED** that Colony's Motion to Dismiss M&S Steel, Inc.,'s Counterclaim, to Have Allegations in Colony's Complaint Deemed Admitted, and to Strike Portions of M&S's Answer and Defenses (Doc. 20) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Colony's Motion to Dismiss M&S Steel, Inc.,'s Amended Counterclaim (Doc. 33) is **DENIED**.

**IT IS FURTHER ORDERED** that Global Power Generation Services of Florida's Motion to Dismiss or Stay (Doc. 46) is **DENIED**.

---

[24] *Id*.

**IT IS SO ORDERED**.

Dated this 14th day of August, 2018.

                                          ERIC F. MELGREN
                                          UNITED STATES DISTRICT JUDGE